ROBERT E. CAREY, Jr. (SBN 47556)
CAREY & CAREY
PO BOX 1040
PALO ALTO, CA  94301-1040
Telephone: (650) 328-5510
Facsimile:   (650) 853-3632

Attorney for Defendant
Robert Williams

## IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:13CR00388-001 CRB |
| Plaintiff, | |
| vs. | **SENTENCING MEMORANDUM SUBMITTED ON BEHALF OF ROBERT WILLIAMS** |
| ROBERT WILLIAMS, | |
| Defendant. | **Date: April 26, 2018**<br>**Time: 1:30pm**<br>**Court: Hon. Charles R. Breyer** |

## I.  INTRODUCTION

Pursuant to a "cooperation" Plea Agreement, Robert Williams entered a plea of guilty to one count of a violation of Title 15 USC 1, Bid Rigging. The United States Probation Office has completed a Presentence Report (PSR) and concluded that the advisory United States Sentencing Guideline (USSG) in this case is Total Offense Level 13, Criminal History Category I, which is consistent with the agreement of the parties. Mr. Williams has no objection to the Guideline calculation or the contents of the PSR.

Mr. Williams requests the Court to find that in consideration of his substantial assistance to the Government, his role in this offense, his substantial health issues, and his extraordinary family responsibilities, a downward variance of two levels is warranted and that he be sentenced

1    to three years' probation, 8 months home detention, a $7,000 restitution payment pursuant to the

2    agreement of the parties, and a fine as recommended by the Government.

3                                    II. **<u>BACKGROUND</u>**

4         Now 64, Bob Williams was born in St. Louis, Missouri, on March 7, 1954. He is the third

5    of seven children born to his married parents. His father was a World War 2 Navy veteran and an

6    iron worker in civilian life. His mother was fundamentally a home maker. Both parents are

7    deceased.

8         Raised in a large Catholic family, Bob's childhood was marked by poverty, his mother's

9    severe depression, his father's periodic alcohol abuse, and the insistence that he and all of his

10   siblings attend Catholic school, which Bob did until high school, when he attended the public

11   Ritenour High School. Bob recalls doing odd jobs in his neighborhood starting at an early age to

12   augment the family income. Except for a sister who is developmentally disabled, all of Bob's

13   siblings contributed to the family largesse. In high school, in addition to working odd jobs, Bob

14   also participated on the basketball team.

15        Bob was particularly close to his maternal grandmother who frequently helped the family

16   financially. Her death, when Bob was a young adult, was particularly difficult for him.

17        Bob's siblings include older brother Charles, a semi-retired real estate broker and fully

18   retired Rear Admiral in the United States Navy Reserves; sister Patricia, a manager in her

19   husband's law office; sister Jaime who is a Senior Vice President at Monsanto Corporation;

20   younger brother Richard, an iron worker; and younger brother Timothy, an assistant district

21   attorney in Albuquerque, New Mexico. Bob also has a younger sister who, as indicated above, is

22   developmentally disabled.

Bob's father died from complications from diabetes and alcohol abuse. His mother died from early onset of Alzheimer's Disease. Mrs. Williams suffered from severe depression for much of her adult life. She was hospitalized numerous times and underwent electroconvulsive therapy multiple times. Despite her struggles, Mrs. Williams was a devoted mother to her seven children.

Soon after graduating from high school in 1972, Bob enlisted in the United States Navy. His older brother Charles enlisted the same day. Charles went on to a distinguished career in the Navy and Naval Reserves, retiring as a Rear Admiral. Bob enlisted for four years in the Navy and was trained as an electronics technician. His military service was performed during the Vietnam War. He was stationed for the most part at Moffett Field in Mountain View, California. He had several temporary deployments to Alaska, Japan, and Korea, during his enlistment. He was an E-5 Second Class Petty Officer at the time of his Honorable Discharge and transfer to the Naval Reserves in December 1976.

His election to discharge from the Navy in 1976 was influenced by Bob's love of Northern California, and his later meeting Gigi Steinhardt. They were married in 1985 and have two grown and independent children. Gigi has also been a professional partner of Bob's. She is a licensed real estate broker.

After discharge from the Navy, Bob worked briefly for an oil company. He became interested in real estate and obtained a broker's license in 1980. Since then he has worked for himself and for a five year period in the 1990's as a franchisee of Better Homes and Gardens Realty. For the most part, Bob and Gigi have worked together buying, rehabilitating, and re-selling residential properties. They operated a successful "mom and pop" real estate company for

24 years before Bob encountered the operators of the bid rigging scheme at county auctions in 2009. Prior to 2009, Bob and Gigi's practice, for the most part, involved non-foreclosure properties.

Having worked successfully in residential real estate only partially describes Bob and Gigi's life together. They have also been caretakers and supporters of vulnerable members of both their families. After Bob's mother passed away in 1995, his developmentally disabled sister had no place to live or adequate resources to survive. Bob and Gigi took her in. She lived with them for over 15 years, before an adequate support system was developed for her in Missouri, where she moved.  They also cared for Gigi's mother who lived with them for several years.

More recently, Bob and Gigi have cared for Gigi's two older disabled sisters. Until recently, 65 year old Deborah and 61 year old Mindy resided in a home owned by Bob and Gigi and were supported by Bob and Gigi. In addition to financial and logistical support, Bob and Gigi ensured that the sisters were safe and attended medical appointments as needed. Circumstances have recently changed, however.

Mindy suffers from Ataxia. She had previously been treated for cancer, which is now in remission. However, the Ataxia affects her motor skills. She uses a wheelchair and has difficulty speaking. Her condition is also characterized by uncontrolled tremors.

Deborah's condition, however, is more acute. Within the last 12 months she has been hospitalized three times. During the last episode she was found by a neighbor barefoot in a rain storm in the middle of a street. She was delusional and treated at Stanford Hospital with anti-psychotic medication. She cannot live independently again. Bob and Gigi have taken her in. Because she cannot return to the home provided by Bob and Gigi, she must stay with them or be

committed. Also as a result, Mindy cannot stay in the independent house without 24 hour care. Consequently, the two disabled sisters are now in Bob and Gigi's residence. Together, Bob and Gigi are caring for them.

The care provided by Bob and Gigi takes place in the context of Bob's serious mental and physical problems. In February 2000, Bob was diagnosed with Bipolar Disorder, characterized by severe mood swings. He is on medication and is treated at Stanford Medical Center, where he also underwent Dialectical Behavioral Therapy. He has also been diagnosed with Type 2 Diabetes, for which he takes medication.

In July 2007, Bob underwent surgery to remove a cancerous tumor from his throat. The surgery was basically unsuccessful, but the subsequent radiation and chemo-therapy has been effective and Bob is currently in remission. However, an after effect of the cancer treatment (Stage 4 Squamous Cell Carcinoma) was the destruction of Bob's saliva glands. Consequently, he must have water available to drink at all times to avoid serious injury.

On January 26, 2011, Bob suffered a heart attack and underwent an angioplasty during which a stent was placed in a blocked artery.  For each of the above conditions, Bob takes medication. For 2017, Bob's cost for these medications exceeded $20,000. Although the myriad medications and doctor's appointments have a monumental impact on Bob's quality of life, he has put together a support system (each of his doctors is at Stanford just three miles from Bob's home) that enables him to function.

As indicated above, Bob's real estate career, in partnership with his wife Gigi, has fundamentally involved identifying properties with rehabilitation and appreciation potential, purchasing them, overseeing rehabilitation/remodel of them, and then resale. For 24 years, Bob

had an unblemished record as a real estate broker.[1] In 2009, as the country was faced with a precarious economy and real estate values were hit hard, Bob explored obtaining properties that were being auctioned off due to foreclosure. His intention and early involvement was to identify properties with potential value and participate in bidding for them. When he began, he knew nothing of the bid rigging scheme that had been concocted by others and that had been operating for years without his knowledge.

When Bob attempted to purchase a property at auction, he was approached and informed that a member of the already operating bid rigging group would out bid him and would continue to present obstacles to his successful participation in bidding. He was given the choice to go along with the group or be blocked from auction purchases. As he has said he deeply regrets, he decided to go along with the bid rigging group. Over a 14 month period, he participated in 17 "rigged" transfers of properties.

Bob was contacted by the FBI regarding the bid rigging scheme and immediately cooperated. He submitted to a thorough debriefing, as did his wife Gigi. His cooperation resulted in investigators gaining a more complete understanding of the bid rigging process and culminated in this Plea Agreement.

### III.

### APPLICABLE SENTENCING LAW

The landmark decision in *United States v. Booker*, 160 L. Ed. 2d 621, 125 S.Ct. 738 (2005), changed sentencing in the Federal Courts. *Booker* renders the Guidelines as advisory

---

[1] The only blemish on Bob's record is the regrettable misdemeanor alcohol related incident during which he exposed himself to a teenager 25 years ago. The incident caused Bob to cease drinking, and attend AA for several years.

only, and instructs the sentencing courts to consider the Guidelines in context of all of those factors enumerated in Title 18 USC 3553(a):

> ". . . Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing. Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable." ***Booker***, at 661.

The Supreme Court addressed the issue of the "presumption of reasonableness" of a within Guidelines sentence in ***Rita v. United States***, 551 S.Ct. 338, 127 U.S. 2456, 168 L.Ed. 2d 203 (2007) and instructed that a within Guideline sentence is presumed reasonable only upon **appellate review**. The Court stated:

> "We repeat that the presumption before us is an *appellate* court presumption. Given our explanation in *Booker* that appellate "reasonableness" review merely asks whether the trial court abused its discretion, the presumption applies only on appellate review." *Rita,* at 351.

Further, the Court instructed:

> "The fact that we permit courts of appeals to adopt a presumption of reasonableness does not mean that courts may adopt a presumption of unreasonableness. Even the Government concedes that the appellate courts may not presume that every variance from the advisory Guidelines is unreasonable." at 354.

The Ninth Circuit reiterated this premise in ***United States v. Edwards***, 595 F.3d 1004, 1015 (9th Cir. 2010) ([Court] cannot presume a sentence is substantively unreasonable only because it falls outside the range recommended by the Sentencing Commission).

The Guideline range is simply the beginning of the analysis for sentencing, not the end. The Ninth Circuit stated:

> "'The Guideline's factor may not be given more or less weight than any other.' So while the Guidelines are the 'starting point and initial benchmark' and must 'be kept in mind throughout the sentencing process,' the Guideline's range constitutes only a touch-stone in the district court's sentencing consideration." ***United States v. Autery***, 555 F.3d 864, 8l72 (9th Cir. 2009)

The Court must now consider 18 USC 3553(a) in its entirety and impose a sentence "sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The court, in determining the particular sentence to be imposed, shall consider –

(1)   The nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   The need for the sentence imposed --

(a)   to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense;

(b)   to afford adequate deterrence to criminal conduct;

(c)   to protect the public from further crimes of the defendant; and

(d)   to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner;

Finally, the Supreme Court has cautioned that respect for the law is promoted in many ways, not always measured by the strictness of sentences or the nature of harsh sanctions. The Court stated:

". . . Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 128 S.Ct. 586, 599, 1696 L.Ed. 2d 445 (2007).

### IV. <u>A SENTENCE SUFFICIENT BUT NOT GREATER THAN NECESSARY</u>

Bob Williams requests that the Court determine that the unique facts of his case warrant a two level downward variance to Total Offense Level 11, Criminal History Category I in Zone B

of the Guidelines, and that he be sentenced to 3 years probation, 8 months of home detention, $7,000 in restitution, an appropriate fine as recommended by the Government, and a $100 special assessment. The factors that warrant the variance include 1) Bob's cooperation with investigators; 2) his relatively short lived participation in this offense and the genesis of his involvement; 3) Bob's extraordinary family responsibilities in caring for his two gravely disabled sisters-in-law; and 4) Bob's complex and debilitating mental health and physical health conditions, which mandate extraordinary and constant monitoring.

Bob began his involvement in the present offense in late 2009 and ceased his involvement at the end of 2010. When contacted by investigators, he immediately cooperated and provided investigators insight into the rigging process. Although available as a witness, the Government chose not to use his testimony at trial. The Government has indicated that nevertheless, his cooperation had value to prosecutors.

Bob began his involvement with foreclosure auctions legitimately and with no intent of corrupt participation. It was when his legitimate efforts were thwarted by the originators of the scheme, that he made the fateful decision to participate, rather than walk away and either develop alternative avenues of business or contact authorities about the rigging. As he has indicated numerous times, Bob regrets his decision and has stated that no amount of money would justify the stress and remorse he feels as a result of his participation.

As a team, Bob and Gigi are able to handle the rather extraordinary demands of completely caring for Gigi's two gravely disabled sisters, both of whom would have to be institutionalized if Bob and Gigi were not available to care for them. Certainly, if Bob were to be incarcerated it is unlikely that Gigi could meet her sisters' needs alone. The recent episode of

1   Deborah being found in the middle of the street, in a rain storm, barefoot and delusional,

2   underscores the precarious nature of her well-being and the need for constant supervision by Bob

3   and Gigi.

4   A commitment to family is not a recent phenomenon for Bob and Gigi. For over 20 years

5   they have cared for vulnerable family members, including Bob's sister, mother, his mother-in-

6   law, and now his two sisters-in-law. Bob and Gigi can handle the demands together, but it is

7   unlikely Gigi could handle it alone should Bob be incarcerated.

8   USSG 5H1.4 states, in part:

9

10   " . . . An extraordinary physical impairment may be a reason to depart downward;
e.g., in the case of a seriously infirm defendant, home detention may be as
efficient as, and less costly than, imprisonment."

11

12   Clearly, Bob Williams suffers from "extraordinary physical impairment." He is

13   undergoing post cancer treatment with the destruction of his saliva glands requiring immediate

14   and constant availability of water. He is being treated for Type 2 Diabetes. He has suffered a

15   serious heart attack and is followed assiduously by a cardiologist. His medications alone cost

16   over $20,000 during 2017.

17

18   Further, Bob Williams suffers from Bipolar Disorder, for which he is medicated and for

19   which he entered and completed an out-patient counseling treatment program. He is being treated

20   at the Bipolar Disorders Clinic at Stanford University School of Medicine.

21   It is evident that managing Bob's physical and mental health issues would require an

22   enormous undertaking by the Bureau of Prisons. He has established long standing therapeutic

23   relationships with medical providers, primarily at Stanford University Medical Center. Under

24   home detention, Bob would be able to maintain his treatment providers at his own expense,

25

sparing tax payers the costs of his complex physical and medical circumstances.

## V. <u>CONCLUSION</u>

Therefore, it is respectfully requested that in light of these facts, the Court find that there is a sufficient basis for a two level downward variance and pursuant to Total Offense Level 11, Criminal History Category I, Robert Williams be sentenced to 3 years probation, 8 months of home detention, $7,000 in restitution, a fine as recommended by the Government and a special assessment of $100.

DATED:        April 19, 2018              Respectfully submitted,


                                          /S/
                                          _____
                                          ROBERT E. CAREY, JR.
                                          Attorney for ROBERT WILLIAMS